Affirmed
and Opinion filed November 17, 2009.

 

In
The

Fourteenth
Court of Appeals



NO. 14-07-00865-CR



Fredrick Jordan
Batts, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 232nd District Court

Harris County, Texas

Trial Court
Cause No. 1091244



 

O P I N I O N 

            Appellant,
Fredrick Jordan Batts, was charged with the first degree felony of engaging in
organized criminal activity with an underlying offense of making a false
statement to obtain credit.[1] 
Appellant, along with seven other co-defendants, was accused of participating
in a mortgage fraud scheme that illegally appropriated approximately $2,234,485.00
from WMC Mortgage Company (“WMC”), a lending institution.  After a jury trial,
appellant was found guilty, and he was sentenced to 25 years in prison.  On
appeal, he raises four issues, contending that:  (1) the evidence is legally
and factually insufficient to support the underlying felony of making a false
statement to obtain credit; (2) the trial court erred in failing to instruct
the jury that four State witnesses were accomplices as a matter of law; and (3)
the State failed to sufficiently corroborate a co-defendant’s accomplice
testimony.  We affirm.

I.  BACKGROUND

Appellant’s
conviction stems from a mortgage fraud scheme allegedly engaged in by appellant
and his seven co-defendants:  James Evans (a real estate attorney), Meheret
Woldie (a loan processor), Keith Wiltz (a real estate appraiser), Mohammad
Asaduddin (a mortgage broker), Doris Wang and Viet Ba Nguyen (real estate
agents), and Cistie Dixon.  The indictment alleged that appellant and his
co-defendants participated in a scheme to swindle WMC out of millions of
dollars by obtaining fraudulently inflated home mortgage loans.  According to
the State’s witnesses, the conspiracy unfolded in the following manner: 
appellant owned two real estate investment companies, Dual Access and Assets
Management of Texas Holding Company (“AMTHC”).  Through Dual Access and AMTHC,
appellant masterminded a complex mortgage scam to defraud WMC by: (1)
contracting to buy property at market value from a homeowner, (2) entering into
a second contract to sell the homeowner’s property to a straw buyer at a price substantially
above market value before actually purchasing the property from the homeowner,
(3) to pay the original homeowner, taking out a mortgage loan in the name of
the straw buyer using falsified loan applications and counterfeit documents, (4)
using the proceeds wrongfully received from WMC to purchase the property from
the original homeowner, and (5) splitting the remaining proceeds with other
participants in the fraudulent scheme.

As
a result of appellant’s fraudulent acts, WMC disbursed more funds that it
otherwise would have loaned, allowing appellant to profit from the difference
between the inflated loan amount and the market value of the property.  Furthermore,
the straw buyer was typically left holding the property in his name and owing WMC
the loan proceeds appropriated by appellant and his co-defendants.  Appellant
and his co-defendants appropriated over $2.2 million on 20 real estate properties. 
At trial, the State focused on five properties:  707 Timber Cove Drive, 525 Arlington
Street, 8614 Misty Sage Court, 8610 Amy Brook Court, and 20406 Long Cypress
Drive.  

707
Timber Cove Drive

Brian
Dewhurst testified that he owned a home at 707 Timber Cove Drive and put the
property on the market in 2005.  He listed Timber Cove at its fair market
value:  $266,000.00.  AMTHC subsequently agreed to purchase Timber Cove, and on
April 6, 2005, Dewhurst signed a contract to sell Timber Cove to AMTHC for
$262,000.00 cash.  The Timber Cove closing was set for the end of April, and
appellant signed an earnest-money check on the sales contract.  Days after the
Dewhurst-AMTHC contract, AMTHC entered into a second contract to sell Timber
Cove to Larry Ransome.  Ransome testified that appellant talked to him about
appellant’s investment businesses, and appellant promised Ransome financial
prosperity by drawing equity out of various residential properties.  Appellant explained
that he would purchase a property below market value and then draw out the
equity by reselling the property at market value to Ransome.  Ransome believed
that appellant was offering a sound investment deal and agreed to purchase
Timber Cove from AMTHC for $460,000.00.[2]
 At the time AMTHC entered into the contract for sale with Ransome, the company
did not own Timber Cove.

Woldie
testified that she and appellant then applied for a mortgage loan in Ransome’s
name.  Woldie testified that Ransome submitted a loan application with accurate
information, but she and appellant subsequently manipulated the information by inflating
his income and the value of his assets.  Woldie further testified that she and
appellant generated counterfeit documents to support the falsified loan
application.  Specifically, a counterfeit escrow receipt was created to reflect
that earnest money was paid in escrow, a counterfeit title policy was created
to reflect that AMTHC had authority from Dewhurst to sell Timber Cove to
Ransome, and a counterfeit assignment of rights and notification was created to
support the counterfeit title policy.  Woldie testified that she altered the
loan application with false information and created the counterfeit title
policy and assignment of rights at appellant’s instruction.  She also testified
that appellant forged the signatures of Ransome and Dewhurst on the assignment
of rights.  A falsified appraisal substantially exaggerating the value of
Timber Cove was also generated to support the loan application.[3]  Ransome
also testified that an affidavit of occupancy and financial status was fake and
falsely reflected that Timber Cove would be used as his primary residence.  Shortly
thereafter, the falsified loan application and supporting counterfeit documents
were submitted to WMC for approval.  

On
April 27, 2005, AMTHC closed on Timber Cove with Dewhurst; however, AMTHC did
not simultaneously disburse the balance owed to Dewhurst.  Accordingly, an
amendment to extend the closing date to May 5, 2005 was executed by AMTHC. 
Appellant signed an earnest money check for the extension.  On May 5, 2005, WMC
funded Ransome’s loan application and transferred $456,838.71 to First Colony. 
First Colony then transferred $446,836.28 to AMTHC.  The following day, AMTHC made
a wire transfer in the amount of $253,903.74 to Allegiance Title Company, the
settlement agent in the Dewhurst-AMTHC sale.  Appellant subsequently signed a
check on AMTHC’s bank account payable to Ransome in the amount of $49,914.28
with the notation “loan proceeds.”  Thereafter, appellant signed and remitted checks
to Ransome for the monthly mortgage payments on Timber Cove.  However, appellant
eventually stopped paying, and Ransome was unable to continue the mortgage
payments.  Consequently, the bank foreclosed on Timber Cove in 2006.

525
Arlington Street

Pineda
Investments owned a house at 525 Arlington Street.  Adriana Pineda, executive
vice president of Pineda Investments, testified that on behalf of Pineda
Investments, she put the Arlington house on the market for sale in 2005 at its
fair market value:  $250,000.00.  On May 11, 2005, AMTHC agreed to purchase
Arlington and entered into a contract for sale to purchase Arlington from
Pineda Investments.  The agreed-upon price was $235,000.00 cash.  Appellant
signed a check drawn on the AMTHC bank account in the amount of $1,000.00 for
earnest money on the contract.  

Shortly
thereafter, AMTHC entered into a second contract to sell Arlington to Philip Askew.
 Askew testified that appellant asked him, as a favor, to purchase Arlington in
Askew’s name.  Appellant explained that he had intended to use Arlington for
his jewelry business with a “silent partner.”  However, the purchase and
business plan had fallen through when the silent business partner did not
purchase the property.  Appellant told Askew that he had secured a discounted
price on Arlington and did not want to pass on such a good buy.  Appellant
promised that he would pay the taxes, mortgage, and maintenance on the
property.  Appellant further promised Askew that he would purchase Arlington
back from Askew within six months.  In exchange for using Askew’s name and
credit, appellant offered Askew the equity in the house, which, according to
appellant, was $40,000.00.  Askew agreed and entered into a contract to
purchase Arlington from AMTHC for $575,000.00.  AMTHC did not own the property
at the time it entered into the contract with Askew.  The contract was later
amended, reducing the sales price to $500,000.00.[4]

Woldie
testified that she and appellant then applied for a mortgage loan in Askew’s
name.  Woldie testified that Askew submitted a loan application with accurate
information, but she subsequently manipulated the information by inflating his
income and the value of his assets.  Woldie further testified that she
generated counterfeit documents to support the falsified loan application,
including forged leases reflecting that Askew was receiving monthly rents from
property he owned and an assignment of rights and notification falsely
reflecting that AMTHC had authority to sell Arlington on behalf of Pineda
Investments.[5] 
Woldie observed appellant forge Adriana Pineda’s signature on the assignment of
rights.  Adriana Pineda also testified that her signature was forged on the
assignment of rights and notification.  Woldie further testified that she
altered the loan application with false information and created the counterfeit
documents at appellant’s instruction.  A falsified appraisal substantially
exaggerating the value of Arlington was also generated to support the loan
application.[6] 
Shortly thereafter, the falsified loan application and supporting counterfeit
documents were submitted to WMC for approval.  

WMC
ultimately funded Askew’s loan application and transferred $498,893.11 to First
Colony, the settlement agent.  First Colony then wired $485,355.46 to AMTHC.  AMTHC
closed on Arlington with Pineda Investments.[7] 
Askew later received a bank wire from AMTHC in the amount of $40,000.00.  Thereafter,
appellant made no mortgage payments and never purchased the property back from Askew. 


8614
Misty Sage Court  

Asher
and Sandra Griffin owned a house at 8614 Misty Sage Court.  The couple put the property
on the market for sale in 2005, and on May 10, 2005, they entered into a
contract to sell Misty Sage to AMTHC for $400,000.00 cash.[8]  Appellant
signed an earnest-money check drawn on the AMTHC bank account in the amount of
$3,000.00.  Days after the Griffin-AMTHC contract, AMTHC entered into a second
contract to sell Misty Sage to Tommie Nicholson.  Nicholson testified that he
believed he was entering into a valid investment agreement with appellant by
purchasing Misty Sage.  Similar to Ransome, appellant promised Nicholson financial
prosperity by drawing equity out of residential properties.  Appellant
explained that he would purchase Misty Sage below market value and then draw
out the equity by reselling the property at market value to Nicholson.  Based
upon appellant’s representations, Nicholson believed appellant’s offer was a
sound investment and agreed to purchase Misty Sage from AMTHC for $575,000.00.[9]  

Woldie
testified that she and appellant then applied for a mortgage loan in Nicholson’s
name.  Woldie testified that Nicholson submitted a loan application with
accurate information, but she subsequently manipulated the information by
inflating his income and the value of his assets.  Woldie further testified
that she and appellant generated counterfeit documents to support the falsified
loan application.  Specifically, a counterfeit escrow receipt was created to
reflect that earnest money had been deposited into escrow.  Also generated were
a counterfeit lease reflecting that Nicholson was receiving monthly rents from
property he owned,[10]
a falsely obtained special warranty deed reflecting that AMTHC had authority
from the Griffins to sell Misty Sage, and a counterfeit assignment of rights
and notification purporting to give AMTHC authority to sell Misty Sage.  Woldie
testified that she altered the loan application with false information and
created counterfeit documents at appellant’s instruction.  She also testified
that appellant forged the signatures on the assignment of rights.  A falsified
appraisal substantially exaggerating the value of Misty Sage was also generated
to support the loan application, valuing the property at $584,000.00.[11]  Nicholson
also testified that his signature was forged on the assignment of rights and on
one of the loan applications.  Shortly thereafter, the falsified loan
application and supporting counterfeit documents were submitted to WMC for
approval.  

WMC
funded Nicholson’s loan application and transferred $571,977.25 to First Colony,
the settlement agent.  First Colony then wired $559,515.47 to AMTHC.  AMTHC
closed on Misty Sage with the Griffins, paying the balance of $383,537.04.  Nicholson
later received a bank wire from AMTHC in the amount of $91,489.00.  Upon the
Nicholson-AMTHC closing, Nicholson moved into Misty Sage.  However, he subsequently
was unable to continue making the mortgage payments, and the bank foreclosed on
the property.

8610
Amy Brook Court

Nicholson
also entered into a contract with AMTHC to purchase a home located at 8610 Amy
Brook Court.  Amy Brook was built in or around 2004 and was placed on the
market at $400,000.00.  The following year, James and Suzanne Armstrong
acquired Amy Brook at a steep discount, purchasing it for $300,000.00. 
However, the Armstrongs put the home back on the market for $360,000.00 two
weeks after they purchased it.    

On
June 22, 2005, Nicholson entered into a contract with AMTHC to purchase Amy
Brook for $515,000.00.[12] 
Nicholson then signed a second contract on Amy Brook agreeing to purchase the
property at a higher price— $550,000.00.  The contract represented that AMTHC
was selling Amy Brook as assignee of the Armstrongs.  However, AMTHC never had the
authority to sell Amy Brook on behalf of the Armstrongs.  On June 28, 2005,
AMTHC entered into a contract with the Armstrongs to purchase Amy Brook for
$360,000.00 cash.  Appellant signed an earnest-money check in the amount of
$3,000.00 drawn on the AMTHC bank account.  The following day, Wiltz
fraudulently appraised the property at $553,000.00.[13]  Nicholson
testified that he believed he was entering into a valid investment agreement
with appellant by purchasing Amy Brook.

 
Woldie testified that she and appellant applied for a mortgage loan in
Nicholson’s name.  Woldie testified that Nicholson submitted a loan application
with accurate information, but she subsequently manipulated the information by
inflating his income and the value of his assets.  Woldie further testified
that she and appellant generated counterfeit documents to support the falsified
loan application.  A counterfeit assignment of rights reflecting that AMTHC had
authority from the Armstrongs to sell Amy Brook was generated and submitted to
WMC.  Additionally, a counterfeit special warranty deed with a vendor’s lien
was submitted to WMC also purporting to give AMTHC authority to sell Amy Brook
on behalf of the Armstrongs.  Woldie testified that she altered the loan
application with false information and created the counterfeit assignment of
rights at appellant’s instruction.  She also testified that appellant forged
the signatures on the assignment of rights.  Nicholson testified that his
signature was forged on the assignment of rights and on one of the loan
applications. Wiltz’s falsified appraisal substantially exaggerating the value
of Amy Brook was also submitted to support the loan application.  Shortly
thereafter, the falsified loan application and supporting counterfeit documents
were submitted to WMC for approval.  

WMC
ultimately funded Nicholson’s loan application and transferred $571,977.25 to
First Colony.  First Colony then wired $559,515.47 to AMTHC.  AMTHC closed on Amy
Brook with the Armstrongs, paying the balance of $345,715.72.  Nicholson later received
a bank wire from AMTHC for approximately $83,000.00, but gave $40,000.00 back
to appellant.  Thereafter, Nicholson was unable to continue making the mortgage
payments, and the bank foreclosed on Amy Brook.

20406
Long Cypress Drive

Deutsche
Bank National Trust owned 20406 Long Cypress Drive in 2005.  Derrick Williams
testified that that he entered into a contract with AMTHC to purchase Long
Cypress as an investment.  Williams testified that he was approached by Tina
Pick, whom he had met through a friend.  Pick asked Williams to purchase Long
Cypress in his name and to resell it back to her the following year.  Pick told
Williams that she was unable to purchase the home with her credit and wanted to
use Williams’s name and credit to acquire Long Cypress.  Pick promised that she
would rent the property for a year and pay the mortgage payments.  Pick also
offered Williams $20,000.00 for use of his credit and assured Williams that she
would purchase the property from him within a year.  

Williams
agreed and entered into a contract for sale with AMTHC to purchase Long Cypress
for $260,000.00.[14] 
Williams’s loan information was gathered and submitted to WMC.  Woldie
testified that she generated a fake lease reflecting that Williams was
receiving monthly rental income on residential property he owned.  Williams
testified that unbeknownst to him, his income and the value of his assets had
been substantially inflated on his loan application.   Williams also testified
that a counterfeit occupancy and financial status affidavit submitted to WMC falsely
represented that he intended to use Long Cypress as his primary residence, when
in fact it was purchased for investment purposes.  A counterfeit assignment of
rights and notification was submitted to WMC, falsely reflecting that AMTHC was
assignee for Deutsche Bank to sell Long Cypress to Williams.  Williams testified
that his signature was forged on the assignment of rights.  Based upon this and
other false information, WMC approved the loan, and Williams closed on Long
Cypress.  

Appellant
signed a check on the AMTHC bank account payable to Pick in the amount of $30,214.10. 
In turn, Pick paid Williams $17,500.00 for use of his credit.  Pick moved into Long
Cypress, but she made only one payment and eventually left the property. 
Williams subsequently learned that title to the Long Cypress was never
transferred in his name but remained in the seller’s name.  Apparently, First
Colony failed to file Williams’s deed with the county.  At the time of trial,
Long Cypress was in foreclosure.

            As
the properties were foreclosed, appellant’s scheme began to collapse.  Harris County
District Attorney’s Office opened an investigation into the activities of
appellant and his two real estate companies.  The district attorney’s office
learned that the scheme included a number of people, some of whom were
prosecuted and some of whom were not.  Appellant and his seven co-defendants
were ultimately charged by felony indictments for their participation in
creating and using false information to obtain mortgage loans from WMC,
defrauding WMC out of over $2.2 million.  Appellant was ultimately found guilty
and sentenced to 25 years in prison.  

            Taken
out of order, appellant raises the following issues:  (1) the trial court erred
in failing to instruct the jury that the straw buyers were not only accomplices
as a matter of fact, but also as a matter of law; (2) the State failed to
adequately corroborate the accomplice testimony of Woldie; and (3) the evidence
is legally and factually insufficient to support the underlying felony of
making a false statement to obtain credit.  

II.  JURY INSTRUCTION

            In
his third issue, appellant challenges the jury instruction regarding accomplice
testimony.[15] 
At trial, the court below instructed the jury that the four straw buyers, Larry
Ransome, Philip Askew, Tommie Nicholson, and Derrick Williams, were accomplices
as a matter of fact.  Appellant now contends that the trial court erred in
failing to instruct the jury that the four straw buyers were not only
accomplices as a matter of fact but also accomplices as a matter of law.  Appellant
contends that he was also entitled to an accomplice-as-a-matter-of-law jury instruction
because the straw buyers (1) were involved in all the fraudulent transactions,
(2) engaged in the same alleged conduct as appellant, (3) received monetary
compensation for their participation in the scheme, and (4) were an integral
part of the combination.  Because appellant made no request in the trial court
that the jury be instructed the straw buyers were accomplices a matter of law,
any charge error is reversible only if egregious harm is shown.  Druery v.
State, 225 S.W.3d 491, 504 (Tex. Crim. App. 2007); Taylor v. State,
7 S.W.3d 732, 737 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d).  Errors
resulting in egregious harm are those that affect the “very basis of the case,
those depriving the defendant of a valuable right, or those that vitally affect
a defensive theory.”  Druery, 225 S.W.3d at 504 (quotations and citations
omitted).    

             An
accomplice is an individual who participates with a defendant before, during,
or after the commission of the crime and acts with the requisite culpable
mental state.   Cocke v. State, 201 S.W.3d 744, 747 (Tex. Crim. App.
2006); Yost v. State, 222 S.W.3d 865, 871 (Tex. App.—Houston [14th
Dist.] 2007, pet. denied).  The participation must involve an affirmative act
that promoted the commission of the offense with which the accused was
charged.  Paredes v. State, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). 
  A witness is not an accomplice merely because he knew of the offense and did
not disclose it, or even if he concealed it.  Druery, 225 S.W.3d at 498;
Cocke, 201 S.W.3d at 748.  A witness may be an accomplice either as a
matter of law or as a matter of fact.  Cocke, 201 S.W.3d at 747.  An
accomplice as a matter of law is one who is susceptible to prosecution for the
offense with which the accused is charged or a lesser included offense.  Paredes,
129 S.W.3d at 536; Jarnigan v. State, 57 S.W.3d 76, 89 (Tex.
App.—Houston [14th Dist.] 2001, pet. ref’d).  If the evidence clearly shows
that the witness was an accomplice as a matter of law, the trial court must so
instruct the jury.  Paredes, 129 S.W.3d at 536; Gonzalez v. State,
63 S.W.3d 865, 881 (Tex. App.—Houston [14th Dist.] 2001), aff’d, 117
S.W.3d 831 (Tex. Crim. App. 2003).  However, if the evidence on the issue is
conflicting or is unclear as to whether the witness is an accomplice, the trial
court must leave to the jury the question of whether the inculpatory witness is
an accomplice as a matter of fact.  Paredes, 129 S.W.3d at 536; Gonzalez,
63 S.W.3d at 881.  Because the evidence determines what accomplice instruction,
if any, needs to be given as to a particular witness, we discuss the status of
each straw buyer separately.  

A.  Larry Ransome

            Ransome
was the straw buyer in the Timber Cove transaction.  At trial, documentary
evidence was introduced to show Ransome’s involvement in the scheme, which
included a loan application, purportedly signed by Ransome, falsely inflating
his income; a fraudulent appraisal; a fraudulent special warranty deed; falsified
closing documents; and a check reflecting loan proceeds paid to Ransome. 
Although the documentary evidence appears, on its face, to implicate Ransome as
an active participant, Ransome testified that he did not assist in falsifying
the loan and closing documents.  Specifically, Ransome testified that (1) he
did not make the false statements regarding his income and assets in the loan
and closing documents, (2) unbeknownst to him, someone had made those false
representations, (3) his signature was forged on the loan application and a
number of other closing documents, and (4) based upon appellant’s
representations, Ransome believed the transaction was proper and legal. 
Ransome testified that appellant convinced him that appellant simply “had drawn
the equity out of the home” by first purchasing it below market value and then
reselling it to Ransome at market value.  The difference between the two sales,
according to appellant, was the equity which would be split between the two. 
Ransome also testified that appellant promised to pay the monthly mortgage
payments until the property was subsequently sold to a third party.  Based upon
these representations, Ransome believed the transaction was legal.

            On
the issue of his status as an accomplice, Ransome’s testimony contradicted the
documentary evidence.  Ransome’s trial testimony raised a fact issue as to
whether he actively participated in the combination and whether he had the
requisite culpable mental state.  Because the evidence on the issue of
Ransome’s status as an accomplice was conflicting, the question of whether he
was an accomplice was for the jury to decide.  See Paredes, 129
S.W.3d at 536; Gonzalez, 63 S.W.3d at 881.  Accordingly, the trial court
did not err in failing to give an accomplice as-a-matter-of-law instruction as
to Larry Ransome. 

B.  Philip Askew

            Philip
Askew was the straw buyer in the Arlington transaction.  The documentary
evidence admitted at trial to establish Askew’s involvement included a real
estate contract between AMTHC and Askew, falsified residential leases
reflecting that Askew was leasing residential property and receiving monthly rental
income, a falsified special warranty deed and assignment of rights and
notification, and a bank wire from AMTHC to Askew reflecting loan proceeds from
the Arlington transaction.  Many of these documents purport to bear Askew’s
signature.  At trial, however, Askew denied any knowledge about or active
participation in the fraudulent scheme.  Askew testified that based upon
appellant’s representations, Askew believed the real estate transaction to be
legal.  He believed that he was merely doing a “favor” for appellant because appellant’s
business partner was unable to put the property in his name.  Askew testified
that he submitted accurate personal income information to appellant; the
false written statements in the loan and closing documents were later added without
his knowledge or consent.  Askew further testified that his signature was
forged on a number of the loan documents, including a real estate contract
between AMTHC and Askew, Askew’s loan application, the assignment of rights and
notification, and a loan affidavit.  Additionally, Askew testified that the falsified
residential leases were created and submitted to WMC without his knowledge or
consent.

            On
the issue of his status as an accomplice, Askew’s testimony contradicted the
documentary evidence.  His trial testimony raised a fact issue as to whether he
actively participated in the combination and whether he had the requisite
culpable mental state.  Therefore, the question of whether he was an accomplice
was for the jury to decide.  See Paredes, 129 S.W.3d at 536; Gonzalez,
63 S.W.3d at 881.  Accordingly, the trial court did not err in failing to give
an accomplice-as-a-matter-of-law instruction as to Phillip Askew. 

C.  Tommie Nicholson

            Tommie
Nicholson was the straw buyer in the Misty Sage and Amy Brook transactions. 
The documentary evidence introduced at trial to show Nicholson’s involvement
included a real estate contract between AMTHC and Nicholson, loan applications falsely
representing Nicholson’s monthly income and his ownership interest in
residential property, a HUD-1 settlement statement falsely representing the
value of Nicholson’s assets, a falsified residential lease reflecting that
Nicholson was leasing property and receiving monthly rental income, a falsified
notification and assignment of rights, and a bank wire transferring loan
proceeds to Nicholson from AMTHC.  Most of these documents were purportedly
signed by Nicholson.  Nicholson testified that his signature was forged on most
of the documents and that he did not assist in making the false statements and creating
the falsified documents.  Nicholson testified that (1) he did not make the
false statements in the loan application and closing documents, (2) he was
unaware that someone had made those false representations, (3) his signature
was forged on his typed loan application and a number of other closing documents,
and (4) based upon appellant’s representations, Nicholson believed the real
estate transactions were appropriate and legal.  

            Nicholson’s
testimony negated the state of mind necessary to be guilty of participating in
the combination.  When there is a question whether a witness is an accomplice,
it is proper to submit that issue to the jury.  See Jarnigan, 57 S.W.3d at
91.  Because the evidence does not clearly show that Nicholson was an
accomplice, the trial court did not err in failing to give an accomplice
as-a-matter-of-law instruction as to Tommie Nicholson. 

D.  Derrick Williams

            Derrick
Williams was the straw buyer in the Long Cypress transaction.  The documentary
evidence introduced at trial to prove Williams’s involvement included a real
estate contract between Williams and AMTHC, the loan application falsely
representing Williams’s income, an occupancy and financial status affidavit
falsely representing that Long Cypress would be his primary residence, and a
falsified assignment of rights.   These falsified documents were purportedly signed
by Williams.  Williams, however, testified that he did not assist in falsifying
the documents and that his signature was forged on most of the documents.  In
fact, Williams learned after the fact that title to Long Cypress was never
transferred to his name but remained in the seller’s name.  Apparently, First
Colony failed to file Williams’s deed with the county.  Williams testified that
he was not aware of the fraudulent acts of appellant and his co-defendants and
believed that he had legally and properly purchased the Long Cypress property. 


            Williams’s
testimony indisputably challenged the state of mind necessary to be guilty of
participating in the combination.  Because the evidence does not clearly show
that Williams was an accomplice, the trial court did not err in failing to give
an accomplice-as-a-matter-of-law instruction as to Derrick Williams.  See
Paredes, 129 S.W.3d at 536; Gonzalez, 63 S.W.3d at 881.

            Despite
appellant’s contentions, the evidence did not conclusively establish that the
straw buyers had the intent to commit the underlying felony with which
appellant was charged or that the straw buyers conspired with appellant to
commit the offense with which he was charged.  The straw buyers’ testimonies
negated the state of mind necessary to be guilty of participating in the
combination and raised a fact issue as to whether they were accomplice
witnesses.  Accordingly, it was appropriate for the trial court to instruct the
jury on an accomplice as a matter of fact rather than as a matter of law.  We
overrule appellant’s third issue.  

III.  CORROBORATION OF WOLDIE’S ACCOMPLICE TESTIMONY

            In
his fourth issue, appellant contends that under the accomplice-witness rule, Woldie’s
accomplice testimony was not sufficiently corroborated to support appellant’s
conviction.  It is well established that a conviction based upon the testimony
of an accomplice must be sufficiently corroborated by other non-accomplice
evidence.  Tex. Code Crim. Proc. art. 38.14.  As a co-indictee, Woldie is an
accomplice as a matter of law.  See Burns v. State, 703 S.W.2d 649, 651
(Tex. Crim. App. 1985); Nolley v. State, 5 S.W.3d 850, 853 (Tex.
App.—Houston [14th Dist.] 1999, no pet.).  Therefore, Woldie’s testimony must
be corroborated by other non-accomplice evidence connecting appellant to the
crime.  Tex. Code Crim. Proc. art. 38.14; Malone v. State, 253 S.W.3d
253, 257 (Tex. Crim. App. 2008).

            In
our review, we eliminate all accomplice testimony from consideration and
examine the remaining portions of the record for any non-accomplice evidence
tending to connect appellant with the commission of the crime.  Malone,
253 S.W.3d at 257.  The corroborating evidence need not prove the defendant’s
guilty beyond a reasonable doubt by itself.  Id.  The evidence must
simply link the accused in some way to the commission of the crime and show
that rational jurors could conclude that this evidence sufficiently tended to
connect the accused to the offense.  Hernandez v. State, 939 S.W.2d 173,
179 (Tex. Crim. App. 1997).  Because no precise rule can be formulated
regarding the amount of evidence required to sufficiently corroborate the
testimony of an accomplice witness, each case must be decided upon its own
facts and circumstances.  Dowthitt v. State, 931 S.W.2d 244, 249 (Tex.
Crim. App. 1996). 

            In
determining whether evidence tends to connect a defendant to the offense, we
must view the corroborating evidence in the light most favorable to the jury’s
verdict.  Brown v. State, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008); Gill
v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).  If the combined weight
of the non-accomplice evidence tends to connect the defendant to the offense,
the requirement of article 38.14 has been fulfilled.  Cathey v. State,
992 S.W.2d 460, 462 (Tex. Crim. App. 1999); Delacruz v. State, 278
S.W.3d 483, 487 (Tex. App.—Houston [14th Dist.] 2009, pet. ref’d).  Thus, for
the conviction to rest upon Woldie’s testimony, there must simply be some
non-accomplice evidence which tends to connect appellant to the commission of
the offense alleged in the indictment.  See Brown, 270 S.W.3d at
567 (quoting McDuff v. State, 939 S.W.2d 607, 613 (Tex. Crim. App.
1997)). 

            Woldie
testified that appellant hired her as a loan processor at AMTHC during the
relevant time period and briefed her on the company’s real estate business
operations.  Woldie testified that appellant owned AMTHC, and through his
business, appellant organized and operated a fraudulent real estate scheme. 
Woldie testified that appellant created and submitted false loan and closing
documents to obtain fully funded mortgage loans from WMC.  She further testified
that the false written statements in the loan and closing documents were either
made by appellant or made at his instruction.  Woldie also testified that
appellant compensated other participants in the scheme for their role in the
combination.

            Appellant
argues that Woldie’s accomplice testimony was the only evidence linking him to the
crime and was not corroborated by other non-accomplice evidence.  Appellant
contends that the remaining non-accomplice evidence reflects only the existence
of a mortgage fraud scheme, but falls short of connecting him to the
combination.  We disagree.  Contrary to appellant’s contention, the State
offered substantial non-accomplice evidence that sufficiently corroborates Woldie’s
testimony.  Specifically, the State introduced documentary and testimonial
evidence that Dual Access and AMTHC were appellant’s companies and that he
committed the fraudulent scheme through the two companies.  Ransome, Askew, and
Nicholson testified that appellant represented himself as the owner and
president of the investment company.  A business card was also introduced
reflecting that appellant was the president of the company.  The State further
introduced the loan and closing documents implicating AMTHC as an active
participant in making false written statements to WMC to obtain mortgage loans. 
These documents falsely reflected that AMTHC had the authority from the
original sellers to convey the properties to the straw buyers.  Moreover, Ransome,
Askew, and Nicholson testified that appellant recruited them to “invest” in the
underlying real estate and promised financial rewards.  The State also introduced
checks signed by appellant, drawn on the AMTHC bank account, payable to his
co-defendants, to the straw buyers, and to others for their roles in the
combination.  Some of these checks were issued for earnest- money deposits and for
subsequent mortgage payments on the properties.  

            The
documentary evidence, coupled with the testimony of Ransome, Askew, and
Nicholson, demonstrated that appellant: (1) owned AMTHC, the company through which
the fraudulent scheme was carried out, (2) personally recruited many of the
straw buyers who participated in the real estate transactions, (3) authorized funds
to be paid to the straw buyers and his co-defendants, and (4) signed mortgage-payment
checks and earnest-money checks relating to the real estate in the underlying
fraudulent transactions.  Viewing the corroborating evidence in the light most
favorable to the verdict, it was reasonable for jurors to conclude that the non-accomplice
evidence tended to connect appellant to the commission of the offense.  Accordingly,
we overrule appellant’s fourth issue.    

IV.  SUFFICIENCY OF THE EVIDENCE

            In appellant’s first and second issues,
he challenges the legal and factually sufficiency of the evidence supporting
the underlying felony of making a false statement to obtain credit.  In
a legal sufficiency review, we view all the evidence in the light most
favorable to the verdict and determine whether a rational jury could have found
the defendant guilty of all the elements of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Williams v.
State, 270 S.W.3d 140, 142 (Tex. Crim. App. 2008).  The jury is the
exclusive judge of the credibility of witnesses and of the weight to be given
to their testimony.  Lancon v. State, 253 S.W.3d 699, 707 (Tex. Crim.
App. 2008).  Reconciliation of conflicts in the evidence is within the
exclusive province of the jury.  Cleburn v. State, 138 S.W.3d 542, 544
(Tex. App.—Houston [14th Dist.] 2004, pet. ref’d).   We must resolve any
inconsistencies in the testimony in favor of the verdict.  Curry v. State,
30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

            In
a factual sufficiency review, we review all the evidence in a neutral light,
favoring neither party.  Watson v. State, 204 S.W.3d 404, 414 (Tex.
Crim. App. 2006).  We then ask (1) whether the evidence supporting the
conviction, although legally sufficient, is nevertheless so weak that the
jury’s verdict seems clearly wrong and manifestly unjust, or (2) whether,
considering the conflicting evidence, the jury’s verdict is against the great
weight and preponderance of the evidence.  Id. at 414–17; Marshall
v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).  We cannot declare
that a conflict in the evidence justifies a new trial simply because we
disagree with the jury’s resolution of that conflict.  Watson, 204
S.W.3d at 417.  If an appellate court determines that the evidence is factually
insufficient, it must explain in exactly what way it perceives the conflicting
evidence greatly to preponderate against conviction.  Id. at 414–17; Rivera-Reyes
v. State, 252 S.W.3d 781, 784 (Tex. App.—Houston [14th Dist.] 2008, no
pet.).  The reviewing court’s evaluation should not intrude upon the fact-finder’s
role as the sole judge of the weight and credibility given to any witness’s
testimony.  Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

             A
defendant commits the offense of engaging in organized criminal activity if,
intending to establish, maintain, or participate in a combination or in the
profits of a combination, he commits or conspires to commit the felony offense
of making a materially false or misleading written statement to obtain credit,
including a mortgage loan.  See Tex. Penal Code §§ 71.02(a)(8),
32.32(b).  On appeal, appellant challenges the sufficiency of the evidence on
the underlying offense of making a false or misleading written statement to
obtain the mortgage loans involved in the case.  Appellant essentially argues
that the evidence proved the existence of mortgage fraud, but fell short of
proving that appellant, himself, knowingly and intentionally made false or
misleading statements to WMC to obtain the mortgage loans.  He cites to the
following evidence:  (1) two homeowners, Dewhurst and Armstrong, had no
dealings with appellant; (2) the evidence did not establish that appellant
owned or managed AMTHC; (3) the evidence did not establish that any of the
fraudulent proceeds were transferred to appellant’s personal bank account; (4)
there is no evidence that AMTHC’s bank account was in fact appellant’s bank
account; (5) the incriminating documents, i.e., the falsified appraisals and
falsified loan application and other documents, were not in appellant’s
possession; and (6) Asaduddin and Woldie, two other co-defendants, worked
independently from appellant and were responsible for the loan-application
process.  According to appellant, this evidence does not sufficiently prove
that he knowingly and intentionally altered the appraisals, loan applications,
and other documents used to obtain inflated mortgage loans from WMC. 

            Contrary
to appellant’s contention, the evidence was legally and factually sufficient to
sustain his conviction.  At trial, the State produced sufficient evidence that
appellant and his co-defendants applied for inflated mortgages on behalf of
buyers and submitted loan applications and other documentation containing false
and misleading information about the buyers’ current residence, employment,
income, assets, and existing debt.  There was evidence of WMC’s reliance on these
false statements in approving loans that it would otherwise have denied.  Woldie,
a key witness against appellant and participant in the scheme, provided
testimony directly linking appellant to the combination and averred that
appellant was the mastermind behind the scheme.  Woldie testified that
appellant instructed her to increase the incomes of the straw buyers on their
loan applications and to create counterfeit documents to support the increased
incomes so that the loans would be approved.  Doris Wang corroborated Woldie’s
testimony, indicating that AMTHC had a computer program to create counterfeit
documents and that she heard appellant ask Woldie to create bank statements
fraudulently increasing a straw buyer’s income.  Each of the straw buyers
testified at trial that the loan documents contained false income information
and that they did not submit the false statements.  Woldie testified that she
and appellant forged the signatures of the straw buyers on the loan
applications.    

            Additionally,
Woldie testified that appellant forged the signatures of the original
homeowners on the assignment of rights and notification forms so that AMTHC could
sign documents for the original sellers as their assignee and to ensure that
AMTHC would receive the loan proceeds from WMC.  She testified that she took
the contracts bearing the original sellers’ signatures to appellant, and he
used the documents as an example to forge the original sellers’ signatures on
the assignment forms.  Woldie further testified that she personally observed
appellant forge the signatures of Brian Dewhurst, Adrianna Pineda, James and
Suzanne Armstrong, and Asher and Sandra Griffin.  These original sellers
confirmed that their signatures had been forged.

            The
State also produced evidence that appellant and his co-defendants sought
mortgages on properties at values greatly in excess of the properties’ actual
sale prices or fair market values.  To support applications for loans in excess
of the properties’ market values, appellant and his co-defendants procured
artificially inflated appraisals.  Using these false and misleading appraisals,
appellant obtained loans in excess of the actual sale value of the property.  The
record reflects that appellant compensated Wiltz for grossly overstating the
value of the properties in the appraisals.  Doris Wang testified that appellant
used only Wiltz to do appraisals. Wiltz would comply with appellant’s request
for appraisal in a certain amount.  Appellant signed approximately 21 checks
payable to Wiltz for his appraisals.  These appraisals were submitted to WMC to
support the falsified loan applications. 

            The
State further produced evidence that appellant masterminded the mortgage fraud
scheme which formed the basis of the indictment and ultimately appellant’s
conviction. Woldie testified that appellant caused her and other co-defendants
to conduct certain fraudulent acts to promote the overall mortgage fraud scheme. 
Woldie’s testimony was corroborated with other documentary and testimonial evidence. 
The straw buyers, most of whom were falsely promised that the properties were
investments and that appellant would find tenants, and use the rent to pay the
mortgages, testified that appellant managed the scheme.  Appellant enticed the
buyers with “no money down” promises and compensation for their participation.  Appellant
signed checks drawn on the AMTHC bank account to complete the fraudulent real
estate transactions.  Appellant wrote the earnest-money checks for the
properties, the checks for the loan proceeds to the straw buyers, and the
checks for the mortgage payments.  Further, AMTHC, appellant’s company, was an
active participant in the fraudulent scheme.  Appellant represented to the
straw buyers that AMTHC was his business.  Appellant handled and controlled AMTHC’s
finances and the flow of funds in the AMTHC bank account.  Appellant also signed
checks for his personal use from the AMTHC account.  Furthermore, the WMC loan
proceeds were consistently wired to AMTHC before being disbursed to
co-defendants and other participants.  

            Based
on the foregoing testimonial and documentary evidence, we find that the
evidence was legally and factually sufficient to sustain the verdict.  We
overrule appellant’s first two issues.  Having overruled all of appellant’s
appellate points, we affirm the trial court’s judgment.








                                                                                    

                                                                        /s/        Adele
Hedges

                                                                                    Chief
Justice

 

 

 

Panel consists of Chief Justice Hedges
and Justices Seymore and Sullivan.

Publish
— Tex. R. App. P. 47.2(b).









[1]
A person commits the offense of engaging in organized criminal activity if,
intending to establish, maintain, or participate in a combination or in the
profits of a combination, he commits or conspires to commit the felony offense
of making a materially false or misleading written statement to obtain credit,
including a mortgage loan.  See Tex. Penal Code §§ 71.02(a)(8),
32.32(b).





[2]
Dewhurst testified that he did not know that appellant had entered into a
contract for sale with Ransome on Timber Cove.





[3]
Wiltz performed an appraisal valuing Timber Cove at approximately $462,000.00. 
Wiltz’s appraisal was purportedly performed on March 1, 2005, before AMTHC
contracted with Dewhurst and Ransome.  Furthermore, the State’s witness Deloris
Lynn Kraft-Longoria, an investigator with the Texas Appraiser Licensing and
Certification Board and a real estate appraiser, testified that the comparables
included in Wiltz’s appraisal to support the market value of $462,000.00 were
not suitable comparables and Timber Cove was not accurately appraised at
$462,000.00.





[4]
Neither of the contracts between AMTHC and Askew required earnest money.





[5]
Askew did not execute the leases and testified that he did not own one of the
properties subject of a lease at the time the lease was purportedly executed. 
Another counterfeit lease purported to lease residential property to
appellant’s employee, Lawrence Williams.





[6]
Wiltz performed an appraisal valuing Arlington at approximately $580,000.00. 
Kraft-Longoria, an expert real estate appraiser, testified that the comparables
included in Wiltz’s appraisal to support the market value of $580,000.00 were
not suitable comparables and Arlington was not accurately appraised at
$580,000.00.





[7]
Appellant was present at closing.





[8]
Cistie Dixon signed the contract for sale on behalf of AMTHC.





[9]
At the time AMTHC entered into the contract for sale with Nicholson, the
company did not own Misty Sage.  Dixon also signed this contract on behalf of
AMTHC.  The Griffins testified that they did not know that AMTHC had entered
into a contract with Nicholson to sell Misty Sage.  Furthermore, Nicholson
testified that he had no knowledge about the previous contract for sale between
AMTHC and the Griffins.





[10]
Nicholson testified that he did not execute the counterfeit lease and that his
signature was forged.  





[11]
Wiltz performed the exaggerated appraisal on Misty Sage.  Kraft-Longoria
testified that the comparables included in Wiltz’s appraisal to support the
market value of $584,000.00 were not suitable comparables and that Misty Sage
was not accurately appraised at $584,000.00.

 





[12]
Dixon signed the contract for sale on behalf of AMTHC.  





[13]
Wiltz performed the exaggerated appraisal on Amy Brook as well.  Kraft-Longoria
testified that the comparables included in Wiltz’s appraisal to support the
market value of $553,000.00 were not suitable comparables and Amy Brook was not
accurately appraised at $553,000.00.





[14]
Dixon signed on behalf of AMTHC.  





[15]
Normally, we consider first the legal and factual sufficiency of the evidence. 
Because appellant also challenges whether the jury should have been instructed
that particular testimony was accomplice evidence and challenges the State’s
corroboration of accomplice testimony, and because these issues affect our
sufficiency review, we consider first the jury-instruction and
accomplice-testimony complaints.